<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MICHAEL KAPLON,

              *Plaintiff*,

    v.

MADISON POLICE DEPARTMENT *et al.*,

              *Defendants*.

Civil Action No. 20-20559

**OPINION**

March 24, 2025

**SEMPER,** District Judge.

This matter comes before the Court on three motions for summary judgment. Defendants Township of Morris, Chief Mark DiCarlo, Police Officer Yeboah, Sergeant Boeninghaus, and Officer Hugh (collectively "Morris Defendants") filed a motion for summary judgment. (ECF 71, "Morris Br.") Plaintiff Michael Kaplon ("Plaintiff") filed a response in opposition. (ECF 73, "Pl. Opp.") Morris Defendants filed a reply. (ECF 77, "Morris Reply".) Defendants Madison Police Department, Chief Darren P. Dachisen Sr., and Police Officer DeCaro (collectively "Madison Defendants") also filed a motion for summary judgment. (ECF 72, "Madison Br.") Plaintiff filed a response in opposition to Madison Defendants and a cross motion for summary judgment against all Defendants. (ECF 74, "Pl. Br.") Madison Defendants replied. (ECF 76, "Madison Reply.") This Court reviewed all submissions made in support of and in opposition to the motions and decided the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78. For the reasons set forth below, Defendants' motions are **GRANTED** and Plaintiff's motion is **DENIED**.

## I.    FACTS AND PROCEDURAL HISTORY[1]

This case arises from Plaintiff's arrest in the early morning of February 11, 2020.  (ECF 71-17, "Morris SMF" ¶ 3.)  At approximately 5:08 a.m. Plaintiff was driving while intoxicated and crashed his mother's car into a utility pole on Punch Bowl Road in Morristown, New Jersey.  (*Id.* ¶ 4.)  Plaintiff's blood alcohol content was .157, almost two times the legal limit. (*Id.* ¶ 3; ECF 71-5, "Morris Ex. D" at 24.)  As a result of the crash, the vehicle was totaled, and the utility pole was broken at the base.  (Morris SMF ¶ 17.)  Plaintiff abandoned the vehicle after the crash and fled the scene.  (ECF 72-1, "Madison SMF" ¶ 3.)

Officer Carmine DeCaro of the Madison Police Department was on routine patrol that morning when he received a radio broadcast of a single car crash into a utility pole on Punch Bowl Road.  (*Id.* ¶¶ 1-2.)  The broadcast also advised that the vehicle was unoccupied and registered to the owner of 7 Constitution Way, which is near Punch Bowl Road.  (*Id.* ¶¶ 3-7.)  The responding officers were aware that there had been prior incidents of car theft in the area.  (Morris SMF ¶ 23; Madison SMF ¶ 24.)  Defendant DeCaro drove towards 7 Constitution Way, and as he approached the address, he observed Plaintiff standing in the rain behind a large street sign.  (Madison SMF ¶¶ 8, 9.)  The mobile video recorder footage from Defendant DeCaro's police vehicle shows Plaintiff hiding behind that sign, with only his legs visible.  (Madison Ex. I at 00:04.)  Defendant DeCaro then activated his body camera, exited the police vehicle, and walked towards Plaintiff while yelling out "Yo!"  (Madison Ex. H at 0:00-0:33; Madison SMF ¶ 12.)  Plaintiff immediately abandoned his hiding spot and walked quickly in the other direction.  (Madison Ex. H at 0:31-0:39.)  Defendant DeCaro pursued Plaintiff on foot, and when Plaintiff began to run, Defendant

---

[1] The factual background is drawn from briefs, depositions, declarations, interrogatories, and the parties' submissions regarding undisputed materials facts.  (*See* ECF 71, 72, 73, 74, 76, 77.)  The entire interaction between Plaintiff and the police is captured on video surveillance through body worn camera footage from Sergeant Boeninghaus and Officer DeCaro respectively (ECF 71-16, "Morris Ex. O"; "Madison Ex. H") and mobile video recorder footage from Officer DeCaro's police vehicle.  ("Madison Ex. I".)

DeCaro chased after him, shouting out "Yo" five times during the pursuit. (*Id.* at 0:40-1:26.) When Defendant DeCaro reached Plaintiff, he grabbed Plaintiff's shoulder and both men fell to the ground. (*Id.* at 1:27-1:29.) Plaintiff landed on his back and instantly began swinging his right arm with a closed fist at Defendant DeCaro. (*Id.* at 1:29-1:33.) Defendant DeCaro attempted to restrain him by placing his hands on Plaintiff's chest, forcing DeCaro to dodge Plaintiff's swinging fists at his head. (Morris SMF ¶¶ 31, 32; ECF 71-9, DeCaro Depo., "Morris Ex. H" at 62:1, 13-23; *see also* Madison Ex. H at 1:30-1:37.) Defendant DeCaro did not strike Plaintiff during this interaction, and he sustained a leg injury in the pursuit and ensuing struggle. (Madison SMF ¶¶ 21, 22.)

Morris Township police were also dispatched to the scene. (Madison SMF ¶ 4.) Officer Kojo Yeboah and Sergeant Clay Boeninghaus responded to 7 Constitution Way as well, and shortly after arriving they observed an individual in dark clothing running away from a police officer and towards the residence. (*Id.* ¶¶ 26, 27.) Defendant Yeboah exited his police vehicle and saw the individual face up on the ground actively swinging his arms at the officer. (*Id.* ¶ 28.) Defendant Yeboah ran to assist and got on top of Plaintiff, which allowed Defendant DeCaro to stand up and tend to his leg.[2] (*Id.* ¶ 30.) Plaintiff continued to swing his arms and kick his legs at Officer Yeboah, who deflected Plaintiff's kicks towards his head with his right arm.[3] (*Id.* ¶ 33.) Officer Yeboah called for help on his radio. (Morris SMF ¶ 34.)

Defendant Boeninghaus's body worn camera captured the remaining interaction between Plaintiff and Morris police that morning. Defendant Boeninghaus was in his vehicle when he heard Officer Yeboah call for assistance over the radio and shout "stop kicking me, stop kicking

[2] Defendant DeCaro did not interact with Plaintiff further. (Madison SMF ¶¶ 20-22.)

[3] Defendant Yeboah included in his police report that Plaintiff hurled racial slurs at him while swinging his arm and legs at his head. (Morris Ex. D at 10.) While Defendant Yeboah was attempting to restrain and arrest Plaintiff, he did not hit or strike him. (Morris SMF ¶¶ 36, 37.)

me." (*Id.* ¶ 46; Morris Ex. O at 2:26-2:36.)  Defendant Boeninghaus left his vehicle and ran to assist.  (Morris Ex. O at 2:36-2:46.)  When he arrived, Plaintiff was face down with his hands under his stomach and refused to release them.  (*Id.* at 2:47-2:52.)  Defendant Boeninghaus repeatedly instructed Plaintiff to "give me your hands" and "stop resisting." (*Id.* at 2:53-3:00.)  In his deposition, Defendant Boeninghaus testified that he did not know what Plaintiff had underneath him that he would not release, and he was concerned that Plaintiff was clutching a weapon.  (ECF 71-11, "Morris Ex. J" at 15:1-17.)  Defendants Boeninghaus and Yeboah each smelled a strong odor of alcohol and marijuana emanating from Plaintiff, and they reported it "was clear that [Plaintiff] was intoxicated due to drugs or alcohol."  (Morris Ex. D at 7, 10.)

After ordering Plaintiff eight times to release his hands and stop resisting, Defendant Boeninghaus punched him in the back.  (*Id.* at 2:58-3:05.)  Plaintiff still did not comply.  (*Id.*)  Defendant Boeninghaus again instructed Plaintiff to release his arms and when Plaintiff did not, he delivered a second punch, and Plaintiff released left arm.  (*Id.* at 3:05-3:09; Morris Ex. D at 6.)  Defendant Boeninghaus then instructed Plaintiff three times to "release your right hand or you're going to get punched again."  (*Id.* at 3:05-3:14.)  Plaintiff again did not comply, and Defendant Boeninghaus delivered a third punch to his back so that Plaintiff would release his right arm. (*Id.* at 3:08-3:25; Morris SMF ¶¶ 49-50.)  Defendant Boeninghaus testified that he did not strike Plaintiff with all his power and instead used the lowest level of physical force required to gain control of him.  (Morris SMF ¶¶ 5253.)  This tactic worked, and the officers were able to handcuff Plaintiff and place him under arrest.  (Morris Ex. O at 3:25-3:40.)  Defendant Boeninghaus also sustained an injury to his right knee from the physical altercation with Plaintiff.  (Morris Ex. D at 7, 38.)

During this entire interaction Plaintiff was wearing a backpack, which he had brought with him after crashing and deserting his mother's car.  (Madison SMF ¶ 25.)  Morris police searched

4

Plaintiff's backpack incident to his arrest. (Morris Ex. O at 13:14-14:00.)  Defendant Boeninghaus's body worn camera shows the officers removing various items and placing them on the hood of a police vehicle while Plaintiff sat nearby in handcuffs.  (*Id.*)  Inside Plaintiff's backpack Defendant Yeboah found multiple prescription pill bottles, many of which were unlabeled, including suspected cannabis pills.[4]  (Morris Ex. D at 10.)  Plaintiff faced a slew of criminal charges, including fourth-degree aggravated assault, possession of a criminally dangerous substance, driving under the influence, and resisting arrest.  (Morris SMF ¶ 6.)  Plaintiff entered a guilty plea to driving under the influence and failure to report a motor vehicle accident on April 27, 2021.  (*Id.* ¶ 7; ECF 71-3, "Morris Ex. B" ¶ 8.)

Plaintiff filed the instant complaint on December 30, 2020.  (ECF 1, "Compl.")  Plaintiff alleges that Sergeant Boeninghaus's three punches caused him permanent nerve and leg damage, and that he still experiences extreme lumbar pain.  (*Id.* ¶ 24.)  Plaintiff asserts claims for false arrest (Count 1), excessive force (Count 2), intentional infliction of emotional distress (Count 3), malicious assault and battery (Count 4), assault and battery (Count 5), negligent training and supervision (Count 6), and violations of his constitutional rights under and the New Jersey Civil Rights Act ("NJCRA") (Count 8) and federal Civil Rights Act codified at 42 U.S.C. § 1983 (Count 9).  (Compl. ¶¶ 34, 42, 51, 64, 70, 76, 82.)  On July 1, 2021, Plaintiff voluntarily dismissed the first count of his Complaint against all Defendants.  (ECF 21.)  Plaintiff has also voluntarily dismissed all claims against Defendant Township of Morris Police Department (ECF 7) and Defendant Officer Oscar Panciano (ECF 55).  In his motion for summary judgment, Plaintiff concedes that Defendants Borough of Madison, Madison Police Department, and Chief Darren P. Dachisen are entitled to summary judgment, leaving Officer DeCaro as the only remaining

---

[4] On February 11, 2020, Plaintiff Michael Kaplon had an approved and active medical marijuana status.  (Morris Ex. D at 11.)  Officers Vanvalen and Ridley of the Morris Police Department, who also responded to the scene, searched Plaintiff's car and found cannabis "shake" within.  (*Id.* at 25.)

Madison Defendant.  (Pl. Br. at 10.)  Plaintiff's outstanding claims are asserted against Morris Defendants Officer Yeboah, Officer Hough, Sergeant Boeninghaus, Police Chief DiCarlo, and the Township of Morris.

## II.    LEGAL STANDARD

A moving party is entitled to summary judgment as a matter of law where "the movant shows that there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

However, the Supreme Court in *Scott v. Harris* determined that the existence of a videotape capturing the events underlying an excessive force claim presents an "added wrinkle" to the general standard requiring courts to construe facts in the light most favorable to the non-moving party.  550 U.S. 372, 378 (2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.*

at 380. Under such circumstances, a court must view "the facts in the light depicted by the videotape." *Id.* at 381; *see also Knight v. Walton*, 660 F. App'x. 110, 112 (3d Cir. 2016) ("Where there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'") (alteration original) (quoting *Scott*, 550 U.S. at 380).

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

### III.   ANALYSIS

Each party moves for summary judgment on multiple grounds. Plaintiff argues that the officers' actions were objectively unreasonable and constituted excessive force. In addition to

arguing that Plaintiff fails to allege facts or produce evidence to create genuine issues of material fact as to his § 1983 and NJCRA claims, Defendants argue that they are entitled to qualified immunity. The Court will first address Plaintiff's constitutional and NJCRA claims, next will turn to the arguments regarding qualified immunity, and then will address Plaintiff's remaining state law tort claims.

### A. Section 1983 and NJCRA Claims

In general, 42 U.S.C. § 1983 establishes a cause of action "against any person who, acting under color of state law, deprives another of his or her federal rights." *Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005). To succeed on a claim under § 1983, a plaintiff must show "(1) the violation of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed or caused by a person acting under color of state law." *Roberson v. Borough of Glassboro*, 570 F. Supp. 3d 221, 226 (D.N.J. 2021) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The NJCRA "is a state law corollary to 42 U.S.C. § 1983—it creates a private right of action for the violation of civil rights secured under the New Jersey Constitution." *Armstrong v. Sherman*, No. 09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010). For this reason, "[t]his district has repeatedly interpreted NJCRA analogously to § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (collecting cases). Thus, "the Court will analyze Plaintiffs' NJCRA claims through the lens of § 1983." *Id. See also Norcross v. Town of Hammonton*, No. 04-2536, 2008 WL 9027248, at *4 (D.N.J. Feb. 5, 2008) ("This Court sees no reason to conclude that in the context of a claim for excessive force during an arrest, the standard under the New Jersey Constitution for evaluating those claims is different from that under the United States Constitution." (citations omitted)).

There is no dispute that Defendants acted under the color of state law when they initiated Plaintiff's arrest. The issue is whether Defendants violated Plaintiff's constitutional rights in so doing. Plaintiff first alleges that Defendant DeCaro lacked probable cause to pursue Plaintiff and that "chasing and tackling" Plaintiff "without giving him a lawful order or identifying himself" was objectively unreasonable. (Pl. Br. at 10.) Next Plaintiff alleges that "the Morris Defendants are liable for damages because they used excessive force while detaining him and after he was detained." (Pl. Opp. at 9.) Thus, the specific questions before the Court are (1) whether Defendant DeCaro had reasonable suspicion to detain Plaintiff and (2) whether Defendants Yeboah and Boeninghaus used excessive force in violation of Plaintiff's Fourth Amendment rights.[5]

### i. *Terry* Stop

The Supreme Court in *Terry v. Ohio* held that law enforcement may conduct brief investigatory stops when an "officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (reiterating that officers must be allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

---

[5] In his opposition papers, Plaintiff raises additional constitutional violations not pled in his Complaint. Plaintiff alleges that Defendants destroyed his property by "dragging his emotional support animals through the gutter" in violation of the Fourth Amendment, (Pl. Br. 15-16), and that Officer Hough violated Plaintiff's Fifth Amendment right against self-incrimination. (Pl. Opp. at 9-10.) First, Plaintiff presents no evidence that the emotional support stuffed animals recovered when officers searched Plaintiff's backpack were dragged through the gutter or otherwise destroyed. Nevertheless, a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008). Accordingly, the Fourth and Fifth Amendment violations Plaintiff now asserts are not properly pleaded before the Court.

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123. Objective justification is based upon the totality of the circumstances, which may include an individual's location, a history of crime in the area, an individual's nervous behavior and evasiveness, and an officer's "commonsense judgments and inferences about human behavior." *See Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (citing *Wardlow*, 528 U.S. at 124–25).

Relevant to the facts here, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* While "refusal to cooperate without more, does not furnish the minimal level of objective justification needed for a detention or seizure . . . unprovoked flight is simply not a mere refusal to cooperate." *Id.* at 125. "Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.* The Supreme Court therefore recognized that "[a]llowing officers confronted with such flight to stop the fugitive and investigate further" does not conflict with an individual's right to be free from unreasonable searches and seizures under the Fourth Amendment. *Id.*

Defendants argue that Officer DeCaro was "constitutionally justified in conducting a *Terry* stop of the Plaintiff." (Madison Br. at 22.) The Court agrees. Plaintiff argues that "police must have probable cause for a crime before they can effect an arrest" and Officer DeCaro lacked probable cause to arrest him. (Pl. Br. at 7.) However, the relevant question here is not whether Officer DeCaro had probable cause to arrest Plaintiff, but whether Officer DeCaro had "a

reasonable, articulable suspicion" to conduct the stop. *Wardlow*, 528 U.S. at 123 ("reasonable suspicion is a less demanding standard than probable cause").

Officer DeCaro was justified in detaining Plaintiff because Plaintiff (1) abandoned the scene of a crime and (2) fled on foot once Officer DeCaro arrived to investigate. On the morning of February 11, 2020, Officer DeCaro responded to the scene of an abandoned motor vehicle accident to assist with an ongoing police investigation. (Madison SMF ¶¶ 2, 8.) Leaving the scene of an accident is a chargeable offense in New Jersey carrying the possibility of a prison sentence. N.J. Stat. Ann § 39:4-129. Police had dispatched officers to help locate the driver and ascertain whether the car had been stolen.[6] (Madison Br. at 21; Madison SMF ¶ 3.) Officer DeCaro testified in his deposition that he had been aware of prior incidents of car theft in that area. (Madison SMF ¶ 24.) When Officer DeCaro arrived, he observed an individual hiding behind a street sign. (Madison Ex. H at 0:00-0:33.) It was reasonable for Officer DeCaro to be suspicious of someone hiding near the scene of a crime at 5:00 a.m. in the rain, and to suspect that such person may be connected to the accident or had stolen the vehicle. *See Wardlow*, 528 U.S. at 124 (noting that an individual's location and the history of crime in the area are relevant contextual considerations in a *Terry* analysis).

It was reasonable for Officer DeCaro to become even more suspicious when the individual abruptly walked in the other direction once Officer DeCaro approached him. When Officer DeCaro exited his marked patrol vehicle and called out to the individual, he turned away and walked away from the uniformed officer. (Madison Ex. H at 0:31-0:39.) Thus Plaintiff's argument that Officer DeCaro was "sneaking up on him" is contradicted by video evidence. (Pl. Br. at 9.) Plaintiff ignored and evaded a police officer, who was following him on foot and repeatedly

---

[6] The Court disagrees with Plaintiff's recitation of the events that "police officers happened upon a one-vehicle collision on Punch Bowl Road with no one in the area." (Pl. Br. at 8.) Officer DeCaro was on patrol when he heard about the accident over the radio and Morris Township Police Department's request for help to investigate. (Madison SMF ¶¶ 2-5.)

shouting "Yo" while Plaintiff was in earshot.  (*Id.* at 0:40-1:26.)  This is certainly the type of "nervous, evasive behavior" that the Supreme Court recognized as a pertinent factor in determining reasonable suspicion.  *Wardlow*, 528 U.S. at 124 (suspect fleeing upon seeing two uniformed officers patrolling in an area known for heavy drug trafficking constituted reasonable suspicion).

Officer DeCaro's suspicions were appropriately raised even further when Plaintiff began running away from him.  (*Id.* at 0:40-1:26.)  "The Supreme Court held that flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion." *United States v. Rogers*, No. 23-582, 2024 WL 2844545, at *3 (D.N.J. June 5, 2024).  Plaintiff's headlong flight, in combination with his presence on that dark, rainy morning near the scene of a crime that Officer DeCaro was investigating, certainly provided reasonable suspicion sufficient for a *Terry* stop.

Plaintiff misapplies case law to the facts present here.  Plaintiff relies on a recent Michigan Supreme Court case to argue that "it is unlawful for police to use force to detain an individual who runs away from them during an investigatory stop."  (Pl. Br. at 9) (citing *People v. Prude*, 15 N.W.3d 249 (Mich. 2024)).  In *Prude*, the Supreme Court of Michigan found the police officers were not justified in detaining a defendant who refused to identify himself to the officers while visiting his girlfriend's apartment complex; defendant was parked legally in the common area of that complex during daylight hours and answered the officers' other questions. *Prude*, 15 N.W.3d at 255. The Court determined there was "no evidence in this case that defendant engaged in *any* suspicious behavior to provide a particularized basis for a seizure."  *Id.* at 258.  The Court contrasted the facts there to the facts of *Wardlow*, finding that "Defendant's failure to identify himself (while answering the officers' other questions) is a far cry from the unprovoked 'headlong flight' in a high-crime area that the Supreme Court held was sufficient to justify a *Terry* stop." *Id.* at 256 (citing *Illinois v Wardlow*, 528 U.S. 119, 124 (2000)).  As discussed above, Plaintiff here certainly engaged in suspicious behavior when he abandoned the scene of a crime, eluded Officer

DeCaro, and started a foot chase through a residential neighborhood. The evidence here demonstrates that Plaintiff first fled from the scene of a crime and then fled from the responding officer, which more closely resembles the facts of *Wardlow*, a Supreme Court decision that is binding on this Court, rather than the Michigan Supreme Court's non-binding decision in *Prude*. The Court is not persuaded by Plaintiff's argument to the contrary.

Plaintiff also argues that Officer DeCaro "committed the primary evil that escalated the matter from a simple motor vehicle investigation into a use of force" when Officer DeCaro caught up to Plaintiff and grabbed his shoulder, causing them both to fall on the ground. (Pl. Br. at 10.) The Supreme Court has "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Indeed, "police officers making a *Terry* stop may tackle, handcuff, or even point their guns at a suspect without effectuating a full arrest." *Rogers*, 2024 WL 2844545, at *4; *see also United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) (holding that the police's tackling of the defendant, who fled from a traffic stop and continued to flee despite repeated orders to stop, was a *Terry* stop). Officer DeCaro was justified in grabbing Plaintiff's shoulder to detain him pursuant to a lawful *Terry* stop, and the Court grants summary judgment in Madison Defendants' favor on Counts 2, 8, and 9.

### ii. Excessive Force

After Officer DeCaro stopped and detained Plaintiff, Officer Yeboah and Sergeant Boeninghaus arrived and attempted to effectuate Plaintiff's arrest. Thus, Plaintiff's claims of excessive force against Morris Defendants relate to the force they used to arrest him.[7]

---

[7] Plaintiff names Officer Hough in his Complaint. At his deposition, Plaintiff acknowledged that Officer Hough never engaged in any physical contact with him, and that the only claim he is asserting against Officer Hough relates to the separation of Plaintiff from his emotional support stuffed animal addressed in Plaintiff's tort claim for intentional infliction of emotional distress. (ECF-71-8, Pl. Depo., "Ex. G" at 60:18-21, 61:4-23.) Therefore, Plaintiff's excessive force claims are asserted only against Defendants Yeboah and Boeninghaus, and the Court will address municipality liability for those claims *infra.*

The right to be free from excessive force during a seizure emanates from the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "A seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968)). "A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates" the Fourth Amendment's protection from unreasonable search and seizure. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633-34 (3d Cir. 1995). "Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." *Groman*, 47 F.3d at 634.

"A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable." *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002). Determining whether use of force is reasonable requires careful attention to the facts and circumstances of each particular case. *Graham*, 490 U.S. at 396. Courts must balance three factors to assess the reasonableness of the force: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Courts must weigh these factors objectively and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). The Third Circuit has outlined additional factors to consider, including whether the force applied caused injury[8], the possibility that the

---

[8] Plaintiff alleges "permanent head, neck, back, arm and mental pain and suffering" as a result of Sergeant Boeninghaus's use of force. (Pl. Br. at 3.) The parties do not otherwise address or make arguments about Plaintiff's injuries. The Court notes that Plaintiff was undergoing treatment for a separate back injury sustained prior to his February 11, 2020 arrest. (ECF 74-3, Pl. Decl. at 353:1-9.) While the court may consider the suspect's

suspect is violent or dangerous, the duration of the police officers' action, whether the force occurred while officers were effecting an arrest, and the possibility that the suspect may be armed. *See Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005).

The three *Graham* factors overwhelmingly favor Defendants. Plaintiff pled guilty to driving under the influence, which is an undoubtedly serious crime with significant public safety implications. *See Spencer v. Biggins*, No. 11-1850, 2013 WL 5702312, at *8 (M.D. Pa. Oct. 18, 2013) (finding Plaintiff's conviction of driving under the influence to be severe). Plaintiff posed an immediate safety threat to the officers when he attempted to physically assault them, and to the general public when he refused to release his arms or explain the unidentified object he appeared to be clutching.[9] The video evidence clearly depicts Plaintiff both evading and resisting arrest, satisfying the last *Graham* factor. (Madison Ex. H at 1:30-1:37). Furthermore, because Plaintiff's entire encounter with the officers before his arrest lasted less than three minutes, and there was a possibility that Plaintiff was armed and dangerous, the additional factors articulated by the Third Circuit also weigh in Defendants' favor. *See Estate of Smith*, 430 F.3d at 150. The officers' seizure was therefore "objectively reasonable in light of the facts and circumstances confronting them[.]" *Graham*, 490 U.S. at 397.

Plaintiff argues that the officers "struck the Plaintiff while he was helpless and defenseless on the ground." (Pl. Opp. at 16-17.) This Court must view the facts "in the light depicted by the videotape." *Scott*, 550 U.S. 372 at 381. Here, the video evidence is conclusive.[10] Though

---

injury, "the central issue is the force the officers employed (and whether it was reasonable under the circumstances), not the injury they caused." *Flood v. Schaefer*, 439 F. App'x. 179, 182 (3d Cir. 2012).

[9] When Officer Yeboah discovered Plaintiff, he was on the ground swinging at Madison Officer DeCaro. (Madison Ex. H at 1:29-1:33.) Plaintiff continued to hurl his fists and legs at Officer Yeboah. (Morris Ex. O at 2:26-2:36.) When Sergeant Boeninghaus arrived less than a minute later, Plaintiff was face down and appeared to be grabbing something underneath him, which Sergeant Boeninghaus suspected was a firearm or other weapon, since Plaintiff had not yet been searched. (Morris SMF ¶ 47.)

[10] There "are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Scott*, 550 U.S. at 378.

"Plaintiff's position is that he was already detained and without the ability to flail arms" (Pl. Opp. at 17), Officer DeCaro's body worn camera depicts Plaintiff swinging his arms and legs directly at him. (Madison Ex. H at 1:29-1:33.) Plaintiff's version of events is plainly contradicted by the video footage of the incident. *See Scott*, 550 U.S. 372 at 381. ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Plaintiff also argues that the officers' actions were "wholly unnecessary and abusive." (Pl. Opp. at 17.) The video evidence here again is dispositive. Despite clear directives to stop resisting, Plaintiff continued to resist and bury his arms beneath him, prompting Sergeant Boeninghaus to use the requisite amount of force to compel Plaintiff to comply. The Court is equally unpersuaded by Plaintiff's argument that he "was struck simply because he was known to the police from prior involvement and was disliked by the Morris police defendants." (Pl. Opp. at 17.) A court must consider whether the officers' actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Norcross*, 2008 WL 9027248, at *4 (quoting *Graham*, 490 U.S. at 397). The Court finds that the officers used the necessary amount of force to subdue Plaintiff, and that this amount of force was objectively reasonable under the circumstances.

For these reasons, the Court finds that there is no genuine dispute of material fact as to whether Defendants Yeboah and Boeninghaus's use of force was reasonable under the circumstances, and the Court grants summary judgment in their favor on Counts 2, 8, and 9.

### iii. *Monell* Liability

Plaintiff also brings a *Monell* claim against Defendant Township of Morris, alleging that he was injured as a result of a city-wide custom, policy and practice. (Pl. Opp. at 8.) To establish

a § 1983 municipal liability claim, a plaintiff "must demonstrate that the violation of rights was caused by the municipality's policy or custom." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690-91 (1978)). A successful *Monell* claim must therefore establish: (1) an underlying constitutional violation; (2) a policy or custom attributable to the municipality; and (3) that the constitutional violation was caused by the municipality's policy or custom. *Monell*, 436 U.S. at 658.

Generally, a municipality cannot be held liable unless one of its employees is "primarily liable under Section 1983 itself." *Williams v. Borough of West Chester*, 891 F.2d 458, 467 (3d Cir. 1989); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curium) (holding that a municipality cannot be held liable under the Fourth Amendment if there is no underlying constitutional violation by the individual officer). Because Plaintiff has not established that the individual officers violated Plaintiff's constitutional rights, Plaintiff cannot establish *Monell* liability on behalf of Defendant Township of Morris.

Moreover, Plaintiff fails to present any evidence of an alleged policy or custom that contributed to the alleged constitutional violations. *See Bocchino v. City of Atlantic City*, 179 F. Supp. 3d 387, 402 (D.N.J. 2016) (granting summary judgment to city on *Monell* claim because plaintiff failed to set forth any evidence from which a reasonable juror could conclude that defendant established a policy or custom that caused plaintiff's injury). Though Plaintiff argues that the relevant policy or custom "stems from the Plaintiff's personal prior interactions with the Morris Defendants" Plaintiff also asserts that "no expert testimony is required to present the Plaintiff's encounters with the Morris Defendants" (Pl. Opp. at 8.) However, Plaintiff's position is belied by the testimony of his own proposed expert Dr. Shane, who reached no opinion from a review of the case that there was a pattern, practice or custom of Morris Township officers using excessive force or unlawfully detaining anyone. (ECF 71-13, "Morris Ex. L" at 31:7-14.) The

absence of factual support for a custom or policy, in addition to the absence of an underlying constitutional violation, compels this Court to grant summary judgment to Defendant Township of Morris on Counts 2, 8, and 9.

### B. Qualified Immunity

Even if Plaintiff's § 1983 and NJCRA claims could survive summary judgment, Defendants' qualified immunity would defeat these claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity "shields federal and state officials from money damages" unless plaintiff can establish "(1) that the [government] official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Diana v. Oliphant*, 441 F. App'x 76, 80 (3d Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). *See also Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007) ("The question at this second step is whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001))). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Olson v. Ako*, 724 F. App'x 160, 164 (3d Cir. 2018) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." *Curley*, 499 F.3d. at 211.

Both prongs of this test compel the Court to find that qualified immunity shields Defendants from liability.  As discussed above, Plaintiff has failed to identify any evidence demonstrating that Defendants violated his Fourth Amendment rights by unlawfully detaining him or using force that was objectively unreasonable under the circumstances.  "An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment."  *Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009).

Even if a reasonable juror could find a Fourth Amendment violation, Plaintiff's right to be free from the use of force by arresting officers was not "clearly established."  Plaintiff has not cited—and the Court is unaware of—any case law stating that police conduct analogous to Defendants' constitutes a Fourth Amendment violation.  *See City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (noting that "clearly established" rights must be established with "specificity" in Fourth Amendment cases).

Because the evidence does not show that Defendants violated Plaintiff's clearly established Fourth Amendment rights, qualified immunity defeats Plaintiff's § 1983 and NJCRA claims.

### C.  State Law Torts

Plaintiff asserts various state law tort claims against Defendants.[11]  Defendants are entitled to immunity against these claims under the New Jersey Tort Claims Act.  The Act provides that "[n]either a public entity nor public employee" is liable for "any injury" caused by "a person resisting arrest or evading arrest" or "any injury resulting from or caused by a law enforcement officer's pursuit of a person."  N.J. Stat. Ann. §§ 59:5–2(b)-(c); *see also Curley v. Klem*, 298 F.3d

---

[11] Madison Defendants argue that Plaintiff's tort claims are barred by the New Jersey Tort Claim Act, because Plaintiff failed to serve timely Notice of Claim on any of the Madison Defendants.  (Madison Br. at 31.)  Plaintiff properly points out that the New Jersey Courts extended the time limit permitted for service of tort claims due to the COVID-19 pandemic.  (ECF 74-3, Pl. Ex. L, Notice to the Bar, dated April 24, 2020) ("Tolling of timeframe for service of valid and timely notices of tort claim will be extended for the additional period from April 27 through May 31, 2020.")  Therefore, Plaintiff timely served its Notice of Claim on Madison Defendants and Plaintiff's tort claims can proceed against them.

271, 283 (3d Cir. 2002) (concluding defendant was entitled to immunity from liability for state tort claims pursuant to § 59:5–2).  Plaintiff's alleged injuries were the result of law enforcement's pursuit of Plaintiff, who was evading and resisting their arrest, which falls squarely within the immunization provisions outlined in § 59:5–2(b) and (c) for public employees and entities under the Tort Claims Act.  *See Pinkston v. City of Jersey City*, 699 F. Supp. 3d 298, 303 (D.N.J. 2023) (finding pursuit immunity applied under § 59:5-2(c) and shielded officers from liability for shooting and injuring a plaintiff after a police chase); *see also Tice v. Cramer*, 627 A.2d 1090, 1094 (N.J. 1993) (finding that pursuit immunity barred negligent training claim against municipality where  a police officer chased a fleeing suspect and the chase ended in a fatal crash) ("[The statute] immunizes the City not only for any respondeat superior liability but for liability on any theory, including a theory that asserts independent negligence apart from respondeat superior.")

Morris Defendants also argue that the New Jersey Tort Claims Act shields public entities from liability for intentional torts.  (Morris Br. at 12) (citing N.J. Stat. Ann. § 59:2-10) ("A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct.")  The New Jersey Supreme Court has recognized, and in fact emphasized, that the approach of the Act is to broadly limit public entity liability.  *Manna v. State*, 609 A.2d 757, 764 (N.J. 1992).  The Court agrees that this statutory provision additionally immunizes Defendant Township of Morris against Plaintiff's intentional state law tort claims.

The immunity provided to Defendants by the New Jersey Tort Claims Act bars Plaintiff's state law tort claims, and the Court grants summary judgment in Defendants' favor for intentional infliction of emotional distress, malicious assault and battery, assault and battery, and negligent supervision and training (Counts 3 through 6).

IV.    **CONCLUSION**

Here, the record is devoid of any facts which demonstrate that Defendants violated Plaintiff's Fourth Amendment rights. As a result, there is no genuine issue of material fact and Defendants are granted summary judgment as to Plaintiff's § 1983 and NJCRA claims. Defendants are immunized from Plaintiff's state law tort claims. For the reasons set forth above, Morris Defendants' motion (ECF 71) and Madison Defendants' motion (ECF 72) are **GRANTED**, and Plaintiff's motion (ECF 74) is **DENIED**. An appropriate Order accompanies this Opinion.


                                  */s/ Jamel K. Semper*
                                 **HON. JAMEL K. SEMPER**
                                 **United States District Judge**

Orig:   Clerk
cc:      Jose R. Almonte, U.S.M.J
         Parties